COUNTY OF ADAMS, State of Colorado;
Robert J. Loew and Darrel L.
Matteson, Petitioners,

v.

Dean HIBBARD and H.D. Garrison,
Respondents.

No. 94SC757.

Supreme Court of Colorado,
En Banc.

June 17, 1996.

Hall & Evans, L.L.C., Alan Epstein, David R. Brougham, Josh A. Marks, Denver, for Petitioners.

Gilbert Goldstein, Denver, Darrel L. Campbell, Englewood, for Respondents.

Justice SCOTT delivered the Opinion of the Court.

The Supreme Court in *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), held that 42 U.S.C. § 1983 (1988) must be "read against the background ... that makes a [person] responsible for the natural consequences of his [or her] actions." Today, thirty years hence, we must decide whether a county or county

officials may be held accountable under § 1983 for conduct that is designed to cause the outright destruction of a citizen's property. On the record before us, we conclude that the intentional misconduct of county officials causing the destruction of private property is a species of tort within the reach of § 1983 and we hold that government officials may be held personally accountable for their unauthorized and deliberate misbehavior under that Congressional enactment.

We granted certiorari to review *Hibbard v. County of Adams,* 900 P.2d 1254 (Colo.App. 1994).[1] Petitioners County of Adams (County), Robert J. Loew, and Darrel L. Matteson (individual defendants)[2] seek reversal of the court of appeals' judgment affirming the trial court's entry of judgment imposing liability under 42 U.S.C. § 1983 (1988) for damage to respondents Hibbard's and Garrison's (plaintiffs) real and personal property. We affirm in part, reverse in part, and remand to the court of appeals with directions that it return this case to the trial court for further proceedings consistent with this opinion.

I

*Facts*

In 1988, the County adopted Ordinance No. 3 to eliminate "blighted areas" in the County. Section III of Ordinance No. 3 provides that "[t]he exteriors of all commercial establishments or multifamily buildings ... shall be maintained so as to present a neat and orderly appearance." Section V states that a commercial establishment or multifamily building must be "kept free of junk, trash, rubbish, debris or refuse of any kind." If the owner of any property fails to comply with these requirements, the property is declared a "cause of blight," and the owner is subject to enforcement proceedings under the ordinance.

---

1. Our order granting certiorari set forth only two issues on review:

    I.   Whether the court of appeals erred in holding the County liable for destruction of property under 42 U.S.C. § 1983.

    II.  Whether the court of appeals erred in holding the County attorneys liable for de-

struction of property under 42 U.S.C. § 1983.

2. Petitioners are collectively referred to as "defendants."

If the ordinance is violated, notice is given to the owner that the subject property must be brought into compliance. If the offending property is not brought into compliance, a hearing is held, and an Administrative Law Judge (ALJ) must make findings as to whether causes of blight exist. If the ALJ finds that causes of blight exist and should be corrected, an administrative order is issued commanding the owner to remove the causes of blight.

Plaintiff Hibbard owned real property within the County. Two buildings were located on the property, one of which was a commercial building damaged by fire in 1983 and had not been repaired (fire damaged building). Plaintiff Garrison worked and lived in the other building (Garrison's residence), which contained various items of personal property belonging to Garrison. In 1989, the County, alleging that the property violated Ordinance No. 3, gave notice to plaintiffs and a hearing was held before an ALJ. In a written decision, the ALJ found that the following "blight factors" existed on the property:

A. [A] building which is vacant and was the subject of a fire in 1983 which pursuant to Section III of Ordinance No. 3, County of Adams, is not a building that is being maintained so as to present a neat and orderly appearance....

B. Pursuant to Section V, this Court finds that junk, loose trash, a semi-trailer, fence posts, barricades, tires, wood, bricks, cones, metal junk, piles of asphalt, acetylene tank, rusted containers, cinder blocks, trash, rusted trailers, an inoperable and unsightly van, an inoperable pickup truck, old and unsightly out-buildings, an old and rusted motor cart are all blighting factors on this particular property.

The ALJ's order required plaintiffs to correct the "blight factors" by a specified date and directed that the fire damaged building was to be disposed of a few days later. If plaintiffs did not comply with the order, the County was authorized to enter the premises, remove the items described, and charge the costs as a lien against the property.

Plaintiffs failed to comply with the ALJ's order, and the County proceeded against plaintiffs' property. While clearing the property, the County razed the fire damaged building set forth in the order and, although they knew Garrison's residence was not covered by the ALJ's order, defendants Loew and Matteson intentionally and deliberately directed the destruction of Garrison's residence and the property Garrison stored in that building.[3]

Plaintiffs filed this action, asserting several claims against defendants. They sought a declaratory judgment that Ordinance No. 3 was not authorized by any Colorado statute and was unconstitutionally vague. Plaintiffs also sought a joint and several judgment for damages against all defendants based on the destruction of Garrison's residence, the items of personalty stored within that building, and the damage to an underground tank, pump, and well.

The trial court upheld the validity of Ordinance No. 3, but determined that the ALJ's order did not authorize the destruction of Garrison's residence and the personalty stored within it. The trial court also found that the individual defendants knew the ALJ's order did not apply to Garrison's residence but willfully ordered its destruction in violation of plaintiffs' constitutional rights.

The trial court entered a judgment for damages in favor of plaintiff Hibbard for $10,000, for plaintiff Garrison for $3,500, and jointly and severally against all defendants. However, it refused to award any damages for razing of the fire damaged building and the harm caused to the tank, pump, and well. The trial court determined that the damage to these objects was a necessary incident to the destruction of the fire damaged building described in the ALJ's order, which the court concluded was properly authorized to be removed.

---

3. As recognized by the court of appeals, zoning violations are more properly enforced by the withholding of building permits, criminal prosecution, or an appropriate civil action in district court. *See* § 30–28–114, 12A C.R.S. (1986); § 30–28–124(1), 12A C.R.S. (1986); § 30–28–124(2), 12A C.R.S. (1986); *Hibbard,* 900 P.2d at 1260.

The court of appeals affirmed in part, reversed in part, and remanded the case for further proceedings. *Hibbard,* 900 P.2d at 1258. The court of appeals stated "that, to the extent that Ordinance No. 3 purports to authorize the County to destroy and remove buildings that do not present a 'neat and orderly' appearance, the same was unauthorized and invalid." *Id.* at 1260.[4] Therefore, the court of appeals reasoned that the County could not rely upon the ordinance as authority for destruction of either building. *Id.*

The court of appeals found that Ordinance No. 3 was an express "policy" of the County and thus, the County was liable for destruction of the two buildings. *Id.* at 1261. Although the plaintiffs sought no damages for the fire damaged building, the court of appeals held the County liable for harm done to other property, such as the underground tank, pump, and well "if such damage resulted from the County's unauthorized action." *Id.* Regarding Garrison's residence, the court of appeals held that the County was liable for damages resulting to it because the unauthorized acts of defendants Loew and Matteson, the county attorney and his assistant, arose out of their interpretation of the ALJ's order which, in effect, "constituted the adoption of an official county policy." *Id.* at 1262.

The individual defendants maintained that the trial court erred by entering judgment against them for damages sustained due to the destruction of Garrison's residence and its contents. The court of appeals disagreed. *Id.* It rejected the individual defendants' contentions that they were sued only in their official capacities and were entitled to qualified immunity. *Id.* at 1262–64. However, the court of appeals held that the individual defendants could not be liable for damage done to the fire damaged building "because it was, at the time the ALJ issued his order and the individuals interpreted it, by no means 'clearly established' that Ordinance No. 3 was partially invalid." *Id.* at 1264. Therefore, the individual defendants were entitled to qualified immunity for damages stemming from the ordinance's partial inval-

idity. *Id.* Finally, because it concluded that Ordinance No. 3 was partially invalid, the court of appeals remanded the case to the trial court for further consideration of damages.

## II

### *Threshold Matters*

Before addressing liability under 42 U.S.C. § 1983, we first examine two threshold matters: (1) whether the two individual defendants were sued only in their "official" capacities; and (2) whether the trial court lacked subject matter jurisdiction to address plaintiffs' § 1983 claim because of ripeness considerations. The individual defendants maintain that they were not sued in their individual capacities. We do not agree. Defendants also contend that the § 1983 claim was premature because plaintiffs failed to seek compensation from the county through state remedies, such as inverse condemnation, a direct taking claim under the Colorado Constitution, or a trespass action. This we address briefly below.

### A

The individual defendants rely on paragraph five of plaintiffs' second amended complaint for their allegations that they were sued only in their official capacities:

Defendant Robert J. Lowe [sic] is the County Attorney for the County of Adams, State of Colorado. Defendant Darrel L. Matteson is an Assistant County Attorney employed by the Adams County Attorney. Each and all *acts of Defendants Lowe* [sic] *and Matteson* set forth herein were done by them, *not as individuals, but under the color and pretense of the ordinances of the County of Adams, State of Colorado.*

(Emphasis added.) The individual defendants also note they were not personally served.

However, in their second amended complaint, plaintiffs specifically sought damages against all defendants on a joint and several basis. Also, the emphasized portion of the

---

**4.** Because the court of appeals found the ordinance invalid, it did not address plaintiff's con-

tention that the ordinance was unconstitutionally vague.

complaint serves only to make the required allegation for a § 1983 claim that the defendants were acting under color of law. *See Screws v. United States,* 325 U.S. 91, 108, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945).

■ When a complaint does not clearly specify whether officials are sued personally, in their official capacity, or both, " '[t]he course of proceedings' " usually establishes the liability sought to be imposed. *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 114 (1985) (quoting *Brandon v. Holt,* 469 U.S. 464, 469, 105 S.Ct. 873, 876, 83 L.Ed.2d 878 (1985)). Throughout the proceedings, the individual defendants acknowledged the suit by affirmatively denying personal liability. *See, e.g.,* Answer to Second Am. Compl. Sixth Affirmative Defense ("Defendants Loew and Matteson in their individual capacities are entitled to official immunity and qualified good faith immunity."); Brief In Support of Mot. for Summ. J. and J. On the Pleadings, Vol. 1, at 237 ("Loew and Matteson are public officials, the County Attorney and Assistant County Attorney who are named as individual defendants in this case."). Significantly, the individual defendants did not seek dismissal because of plaintiffs' failure to allege individual liability. Rather, they sought dismissal based on personal immunity from suit. Also, by attacking the substantive claims raised by the plaintiffs, the individual defendants waived their objection to personal service and subjected themselves to the court's jurisdiction. *See Brown v. Amen,* 147 Colo. 468, 472, 364 P.2d 735, 737 (1961).[5]

**B**

Defendants maintain that the plaintiffs' § 1983 claim was not ripe. However, we denied certiorari on the ripeness issue. Then, after plaintiffs filed a motion for clarification of issues presented for certiorari review, we specifically stated that "[t]he court did not grant certiorari review on whether

the § 1983 claim was ripe." Therefore, we decline a third invitation to address defendants' contention that plaintiffs' § 1983 claims are not ripe.

**III**

*County Liability*

■ In relevant part, 42 U.S.C. § 1983 (1988) provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of The United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

We begin with the proposition that "Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). Under § 1983, a municipality can be sued directly where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.; see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 128, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (plurality opinion) ("The city cannot be held liable under § 1983 unless respondent proved the existence of an unconstitutional municipal policy.").

**A**

As acknowledged by the defendants, "[i]n this case, the Board of County Commissioners is the policy maker and, as such, it created a policy through the enactment of Ordinance No. 3." Petitioners' Opening Brief at 13; *see also* Petitioners' Reply Brief at 4

---

**5.** In *Kentucky,* the Court stated that "[t]here is no longer a need to bring official-capacity actions against local government officials, for under *Monell [v. New York City Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ],*

... local government units can be sued directly for damages and injunctive or declaratory relief." *Kentucky,* 473 U.S. at 167 n. 14, 105 S.Ct. at 3106 n. 14.

("[T]he [Colorado] Court of Appeals properly concluded that Ordinance No. 3 was a 'policy' for purposes of municipal liability under 42 U.S.C. § 1983 . . . .").

The court of appeals concluded that Ordinance No. 3 was invalid because the County was not authorized to adopt such a regulation.[6] *Hibbard*, 900 P.2d at 1259. Because the ordinance was unauthorized under state law,[7] the court of appeals did not address plaintiffs' contention that the ordinance was unconstitutionally vague. *Id.* However, it still held the County liable "to the extent that the actions of the County's agents in destroying the two buildings were authorized by Ordinance No. 3 . . . ." *Id.* at 1261.

■ Under § 1983, a plaintiff must prove that "(1) a person (2) acting under color of state law (3) subjected the plaintiff or caused the plaintiff to be subjected (4) to the deprivation of a right secured by the Constitution or the laws of the United States." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 829, 105 S.Ct. 2427, 2439, 85 L.Ed.2d 791 (1985) (Brennan, J., concurring). Under *Monell*, the County is a "person" for purposes of § 1983. Also, by adopting Ordinance No. 3, the County was acting "under color of law." *See id.* At the destruction site, the two individual defendants also acted "under color of law" by taking action pursuant to Ordinance No. 3, even though the individual defendants' actions were unauthorized.[8] Plaintiffs satisfy the first part of the causation element by establishing the existence of a municipal policy, embodied in Ordinance No. 3. *See id.* But plaintiffs must also establish that the County's actions caused "the deprivation of a right secured by the Constitution or laws of the United States." *Id.*

In the present case, there is no evidence that plaintiffs incurred any harm as a direct result of County policy. Plaintiffs sought no damages for the destruction of the fire damaged building itself. *Hibbard*, 900 P.2d at 1261. Regarding the utility and value of the underground tank, pump, and well, the trial court found plaintiffs' testimony (like much of plaintiffs' testimony) "to have been totally devoid of credibility."[9] Based upon the record before us, the County did not cause any damage giving rise to the deprivation of a federal right.

Ordinance No. 3 did not articulate a building destruction policy subject to the discretion of the county attorney and his assistant. Therefore, the County is not liable for damage done to Garrison's residence and its contents. Damage to Garrison's residence resulted from the unilateral acts taken by the individual defendants, not a particular action taken by the County. *See id.* County policy or custom did not cause any damage in the present case.

B

While Ordinance No. 3 represents County policy, the court of appeals also premised County liability on the two individual defendants' behavior at the destruction site. Concluding the two individual defendants were policymakers, the court of appeals stated that "[w]ith respect to the meaning and breadth of the ALJ's order, we are convinced that the interpretation placed upon it by the county attorney and his assistant [the two

6. We did not grant certiorari to review the validity of Ordinance No. 3, so the court of appeals' conclusion is not before us. The court of appeals noted that the statute it relied upon was amended in 1990. *See Hibbard*, 900 P.2d at 1260.

7. We note that the ordinance's invalidity pursuant to state law does not by itself establish municipal liability under § 1983. *See Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1104 (8th Cir.1992).

8. Acting "under color of law" alone, however, does not create municipal liability under § 1983. The plaintiffs must show that the illegal action was caused by the County, not a nonpolicymak-

ing municipal employee. *See Tuttle*, 471 U.S. at 829, 105 S.Ct. at 2439 (Brennan, J., concurring). A plaintiff meets this burden by establishing the existence of a municipal policy. *Id.* In the present case, County liability does not attach based upon the actions of the individual defendants because they were not policymakers. *See infra* part IIIB.

9. The trial court also found any damage to the underground pump, tank, and well to have been "incidental." *See, e.g., City of Northglenn v. Grynberg*, 846 P.2d 175, 179 (Colo.1993) ("In no case has mere depreciation in value been grounds to award just compensation for a damaging of property.").

individual defendants] constituted the adoption of an official county policy." *Hibbard,* 900 P.2d at 1262. We disagree. The two individual defendants were not policymakers for purposes of municipal liability under § 1983.

■ Congress intended municipal liability only when actions taken "pursuant to official municipal policy of some nature caused a constitutional tort." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. In particular, a local government cannot be liable under § 1983 "*solely* because it employs a tortfeasor. . . ." *Id.* Under § 1983, municipal liability cannot attach on a respondeat superior theory. *Id.* The Court stated:

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694, 98 S.Ct. at 2037.

Under *Monell,* municipalities may only be held liable for actions taken pursuant to a "custom" or "policy." *Tuttle,* 471 U.S. at 818, 105 S.Ct. at 2433 (plurality opinion) ("[T]he *Monell* Court held that only deprivations visited pursuant to municipal 'custom' or 'policy' could lead to municipal liability.").

The "policy" requirement was "intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479–80, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). To recover from a municipality, a plaintiff must establish that the municipality has "officially sanctioned or ordered" an act. *Id.* at 480, 106 S.Ct. at 1298. Under this rationale, municipal liability may attach for a single decision by policy makers under certain circumstances. *Id.*[10]

■ However, a municipality is liable "only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481, 106 S.Ct. at 1299 (plurality opinion). The mere existence of an official's discretion does not "give rise to municipal liability based on an exercise of that discretion." *Id.* at 482, 106 S.Ct. at 1299 (plurality opinion); *see also Praprotnik,* 485 U.S. at 126, 108 S.Ct. at 926 (plurality opinion) ("If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability."). Before municipal liability attaches, a state official "must also be responsible for establishing final government policy. . . ." *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300 (plurality opinion).[11]

---

10. Policy acts or edicts may not necessarily involve written rules intended to be applied consistently over time. *See id.* at 480–81, 106 S.Ct. at 1298–99. A local government "frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations." *Id.* at 481, 106 S.Ct. at 1299. In *Pembaur,* the Court explained:

> If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

*Id.* (footnote omitted).

11. The plurality offered the following illustrative hypothetical:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employ-

A determination of whether an official constitutes a policymaker is a matter of state law. *Praprotnik*, 485 U.S. at 124, 108 S.Ct. at 924–25 (plurality opinion); *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300 (plurality opinion). In *Pembaur*, the plurality noted "that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483–84, 106 S.Ct. at 1300 (plurality opinion); *see also Tuttle*, 471 U.S. at 823, 105 S.Ct. at 2436 (plurality opinion) (" '[P]olicy' generally implies a course of action consciously chosen among various alternatives. . . .").

The Board of County Commissioners articulates zoning policy for each county. *See, e.g.*, § 30–28–113(1), 12A C.R.S. (1986) ("[B]oard of county commissioners . . . may regulate . . . the location, height, bulk, and size of buildings and other structures, the percentage of lot which may be occupied, the size of yards, courts, and other open spaces, the uses of buildings . . . ."). The county attorney only enforces that policy. The county attorney's exercise of discretion in interpreting the ALJ's order reflects, without more, only a departure from policy. *See Praprotnik*, 485 U.S. at 127, 108 S.Ct. at 926 (plurality opinion) ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality."). Because the Board possesses the authority to make *final* policy regarding zoning matters, it retains the authority to make municipal policy in that area. *See id.*

The court of appeals relied on *Medberry v. People*, 107 Colo. 15, 108 P.2d 243 (1940), for its conclusion that the county attorney and his assistant were policymakers. In *Medberry*, we described the duties and responsibilities of a county attorney in Colorado:

> Under the statutes of Colorado a county attorney is employed primarily as the legal advisor of the county commissioners in whose discretion reposes the power of appointment. In certain matters he advises other county administrative officers, appears for the county in cases involving dependent, neglected and delinquent children, in lunacy inquests and, when directed by the county commissioners, in civil litigation to which the county is a party or in which it is interested.

*Id.* at 19, 108 P.2d at 245 (citation omitted). However, a county attorney's duty to generally "advise other county administrative officers" does not by itself create policymaking authority in the specific area of zoning. To be a policymaker, the governmental official or officials must be "responsible for establishing final policy *with respect to the subject matter in question.*" *Pembaur*, 475 U.S. at 483–84, 106 S.Ct. at 1300 (plurality opinion) (emphasis added).

Unlike *Pembaur*, the county attorney and his assistant do not make final policy "with respect to the subject matter in question." In *Pembaur*, a physician refused entry to his clinic by Hamilton County Deputy Sheriffs and Cincinnati police, who were attempting to issue capiases for the arrest and detention of two of his employees. *Id.* at 472–73, 106 S.Ct. at 1294–95. After access was denied, the Deputy Sheriffs called their supervisor for further instructions. *Id.* The supervisor told the Deputy Sheriffs to contact the Assistant Prosecutor. *Id.* at 473, 106 S.Ct. at 1295. They did, and the Assistant Prosecutor conferred with the County Prosecutor, who gave instructions to "go in and get [the witnesses]." *Id.* The Court concluded that "[i]n ordering the Deputy Sheriffs to enter petitioner's clinic the County Prosecutor was acting as the final decisionmaker for the county, and the county may therefore be held liable under § 1983." *Id.* at 485, 106 S.Ct. at 1301. In *Pembaur*, the Court found under Ohio law that the Prosecutor "could establish county policy under appropriate circumstances. . . ." *Id.* at 484, 106 S.Ct. at 1301. The County Prosecutor did not merely render "legal advice." *Id.* The County Prosecutor possessed final authority to instruct the

---

ment policy to the Sheriff, the Sheriff's decisions *would* represent county policy and could give rise to municipal liability.

*Pembaur*, 475 U.S. at 483 n. 12, 106 S.Ct. at 1300 n. 12 (plurality opinion).

officers to enter the premises. In the present case, the county attorney was not imbued with any authority under the ordinance, rather, his authorized acts were limited to implementing the policy of Ordinance No. 3 as set by the Board of County Commissioners. As a matter of state law, the Board possessed final policymaking authority in the area of zoning.[12]

Because the two individual defendants were not policymakers, County liability does not attach for destruction of the contents of Garrison's residence due to the county attorney's and his assistant's actions at the destruction site.

## IV

### *Individual Liability*

■ As public officials, the two individual defendants claim they are entitled to qualified immunity. We agree in part and disagree in part. Two kinds of immunity defenses exist. *Harlow v. Fitzgerald,* 457 U.S. 800, 807, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). Absolute immunity is available only "[f]or officials whose special functions or constitutional status requires complete protection from suit. . . ." *Id.; see also Higgs v. District Court,* 713 P.2d 840, 852 (Colo.1985). Qualified immunity, on the other hand, represents the norm for executive officials. *Harlow,* 457 U.S. at 807, 102 S.Ct. at 2732; *Higgs,* 713 P.2d at 852. "Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official." *Harlow,* 457 U.S. at 815, 102 S.Ct. at 2736. In *Harlow,* the Court stated "that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738; *see also Higgs,* 713 P.2d at 852. The qualified immunity defense should fail if the law was clearly established because "a reasonably competent public official should know the law governing his [or her] conduct." *Har-*

*low,* 457 U.S. at 819, 102 S.Ct. at 2738. An objective test for qualified immunity balances the competing interests of citizen rights and independent exercise of official authority. *Higgs,* 713 P.2d at 852. In *Harlow,* the Court observed:

> By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he [or she] should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken "with independence and without fear of consequences." *Pierson v. Ray,* 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967).

*Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738–39 (footnotes omitted); *Higgs,* 713 P.2d at 852 (quoting *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738–39).

■ The individual defendants are not entitled to qualified immunity for the destruction of Garrison's residence or his personal property. Regarding that building and its contents, the trial court found that "the actions of Defendants were a willful deprivation of Plaintiffs' civil rights in contravention of 42 U.S.C. [§] 1983." *See also Crouse v. City of Colo. Springs,* 766 P.2d 655, 660 (Colo. 1988) ("The due process clause of the fourteenth amendment protects individuals from deprivation of liberty by deliberate abusive or harsh conduct by state officials.").

In its Order and Judgment dated April 14, 1992, the trial court found that "Defendant Matteson *knew* the garage/shop building [Garrison's residence] was not covered and

---

**12.** The two individual defendants' subjective views are irrelevant. Policymaker status must be determined objectively by reference to state law.

so advised Defendant Loewe [sic]...." (Emphasis added.) A reasonable public official would be expected to know that razing a private building and its contents out of personal convenience violated constitutional protections. *See id.* ("[O]utrageous abuse of government authority directed against citizens is precisely the type of misconduct which the remedies created by Congress in § 1983 were designed to deter."). Clearly established law should have made the individual defendants hesitate before destroying property not covered by the ALJ's order. A reasonable public official would have hesitated before destroying private property. The individual defendants improperly razed a building under the belief that a lawsuit would be "cheaper" than according plaintiffs the benefit of the process contemplated under Ordinance No. 3.

The trial court stated:

[I]t is the Court's finding that, as to Plaintiffs' garage/shop building [Garrison's residence] and contents, the actions of Defendants were a willful deprivation of Plaintiffs' civil rights in contravention of 42 U.S.C. [§] 1983.... Plaintiffs have proved by a preponderance of the evidence that they were deprived of their civil rights without due process of law by Defendants who were acting willfully and under color of their official authority to the limited extent set forth above.

We agree. Conduct of public officials that results in the intentional and knowing destruction of private property should be repudiated and subjected to the same reproach we would apply to similar conduct by any other person. A public official who knowingly and capriciously acts outside the authority of government to deprive a citizen of property rightfully that of the citizen should not be able to escape liability by donning the cloak of government action as an aid to his or her defense. Because the individual defendants knowingly and intentionally acted outside their authority under the ALJ order and deliberately deprived plaintiffs of their procedural and substantive due process rights by causing the arbitrary destruction of their private property, we hold them individually liable for their unwarranted conduct.

V

In sum, the County is not liable for damages done to Garrison's residence as a consequence of the unilateral acts of the individual defendants, who were not policymakers of the County. The individual defendants, who are not entitled to qualified immunity, must stand accountable for their deliberate and willful acts when, although they knew Garrison's residence was not covered by the ALJ's order, they intentionally called for the destruction of Garrison's residence because, in their view, avoiding clearly established procedures would be cheaper. However, we reverse the judgment of the court of appeals as to the fire damaged building. Plaintiffs did not seek damages for its destruction, and on the record before us, we express no opinion as to claims for damages related to the fire damaged building.

Accordingly, we affirm the court of appeals in part, reverse in part, and remand to that court with directions that it return this case to the trial court for further proceedings consistent with this opinion.

MULLARKEY, J., concurs in part and dissents in part.

KOURLIS, J., joins in the partial concurrence and dissent.

Justice MULLARKEY concurring in part and dissenting in part:

I concur in the majority's partial reversal of the court of appeals' judgment. I respectfully dissent, however, from the majority's holding that the individual defendants, Robert J. Loew and Darrel L. Matteson, violated the procedural and substantive due process rights of the plaintiffs, Dean Hibbard and H.D. Garrison.

The plaintiffs brought this action in the district court alleging an unlawful taking of their property and the deprivation of their due process rights. The takings claim has been abandoned in this court and the majority rightly does not address that claim. The due process claim, as pled in the complaint, did not specify whether the plaintiffs were asserting a procedural due process claim or a

substantive due process claim or both. The trial court, relying on the plaintiffs' written final argument, interpreted the due process claim as procedural. My review of the plaintiffs' final argument shows the plaintiffs argued only that they had not had proper notice and an opportunity to be heard. Thus, I agree with the trial court that only a procedural due process claim was asserted.[1]

On the merits, the trial court found that the plaintiffs had waived any procedural due process claim by failing to timely perfect their appeal of the Administrative Law Judge's (ALJ's) decision. The plaintiffs' attempt to appeal pursuant to C.R.C.P. 106(a)(4) was dismissed as untimely and that decision was not appealed.

Despite the trial court's ruling, the majority concludes that the individual defendants "deliberately deprived plaintiffs of their procedural and substantive due process rights." Maj. op. at 221. I disagree. In my view, the trial court properly disposed of the procedural due process claim when it found that there was no violation. Having failed to present a substantive due process claim at trial, the plaintiffs are foreclosed from asserting such claim on appeal. Assuming, *arguendo*, that the substantive due process claim is properly before us, the trial court's factual findings do not support the majority's conclusion that the individual defendants violated the plaintiffs' substantive due process rights.

Turning first to the procedural due process claim, the law is clear that a procedural due process claim may not be brought pursuant to 42 U.S.C. section 1983 (1988) if there is an adequate state remedy. *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). Here the trial court correctly concluded that the plaintiffs had no procedural due process claim because they failed to pursue their remedies under C.R.C.P. 106(a)(4).

Second, a substantive due process claim cannot be raised for the first time on appeal. "It is axiomatic that in any appellate proceeding this court may consider only issues that have actually been determined by another court or agency and have been properly presented for our consideration." *Committee for Better Health Care for All Colo. Citizens v. Meyer,* 830 P.2d 884, 888 (Colo.1992) (citing *Dempsey v. Romer,* 825 P.2d 44, 57 n. 13 (Colo.1992); *Colgan v. State, Dept. of Revenue, Motor Vehicle Div.,* 623 P.2d 871, 874 (Colo.1981)).

Third, assuming the claim is properly before us, the plaintiff cannot prevail on substantive due process because the trial court's factual findings do not support that claim. "If appellant's § 1983 claim is construed to be based on an alleged violation of substantive due process, then the claim must be based either on a violation of an explicit constitutional guarantee (*e.g.,* a fourth amendment illegal seizure violation) or on behavior by a state actor that *shocks the conscience.*" *Braley v. City of Pontiac,* 906 F.2d 220, 225 (6th Cir.1990)(emphasis supplied).[2] *See also Haag v. Cuyahoga County,* 619 F.Supp. 262, 278 (N.D.Ohio 1985) (a substantive due process claim may be pursued under section 1983 only if the conduct rises to the level of a constitutional tort, *i.e.,* it shocks the conscience), *aff'd without op.,* 798 F.2d 1414 (6th Cir.1986). The trial court's findings do not support the conclusion that the individual defendants' conduct shocks the conscience. It found that the individual defendants' conduct was willful but not egregious. Such findings do not equate to a showing that their conduct shocks the conscience.

---

1. The court of appeals did not address the nature of the due process claim and stated only in conclusory terms that the action of the individual defendants was "a taking of property without compensation and without due process of law." *Hibbard v. County of Adams,* 900 P.2d 1254, 1264 (Colo.App.1994).

2. In *Brown v. Hot, Sexy and Safer Productions, Inc.,* 68 F.3d 525 (1st Cir.1995), the First Circuit Court of Appeals explained that a plaintiff may bring a substantive due process claim under two theories. The first requires the demonstration of deprivation of an identified liberty or property interest protected by the Fourteenth Amendment. *Id.* at 531. The second does not require proof of the deprivation of a specific property or liberty interest; rather the plaintiff must prove that the state's conduct "shocks the conscience." *Id.* (quoting *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952)).

The pivotal issue at trial was whether the ALJ's order authorized the destruction of a garage shop owned by Hibbard and used as a residence by Garrison. In addition to the fire-damaged building, the ALJ order identified the following as blight or blight factors:

junk, loose trash, a semi-trailer, fence posts, barricades, tires, wood, bricks, cones, metal junk, piles of asphalt, acetylene tank, rusted containers, cinder blocks, trash, rusted trailers, an inoperable and unsightly van, an inoperable pickup truck, old and unsightly out-buildings, an old and rusted motor cart, and parts of machinery and appliances.

In its oral ruling, the trial court found the phrase "old and unsightly outbuildings" to be ambiguous and its meaning could not be determined from the four corners of the ALJ's order. To determine whether the garage shop was covered by that phrase, the court resorted to extrinsic evidence, including the transcript of the administrative hearing. In its written order, the trial court reached the following conclusion:

The question of whether the administrative law judge's order authorized the destruction of this garage shop building was debatable, because of the ambiguities in the order; however, since the Court finds and concludes that Defendant Matteson knew the garage shop building was not covered and so advised Defendant Loew, Defendants' conduct was willful.

Although it found the individual defendants' conduct willful, the trial court also found that their conduct was not so egregious as to support an award of punitive damages. In reaching its conclusions, the trial court found a number of extenuating circumstances. It initially found that the ALJ, not the county, had drafted the order and that the order was ambiguous. The court emphasized that the individual defendants' conduct should be evaluated in light of the fact that the overall property was in very bad condition and described the property as: "cluttered, messy, unattractive, ill-kempt [sic], [and] deteriorated." Testimony at trial indicated that the garage shop, where plaintiff Garrison was living, had no running water or sewer, and raw sewage had been dumped behind the building. Some of the windows had been boarded up. Photographs used as exhibits at trial show that the garage shop was similar in appearance to the fire-damaged building and other out-buildings. According to the court, the garage shop was not easily distinguishable from other property slated for destruction. In the court's words, it was not a question of "one eyesore in the midst of a manicured garden [that] can be easily singled out for surgical excision."

After the blight clearance process had begun, it was halted by a temporary restraining order obtained by the plaintiffs. The county and individual defendants complied with the court order and the garage shop was not demolished until after the order had been dissolved due to the failure of plaintiffs to file a complaint.

The trial court also noted that the plaintiffs were not present when the razing occurred. It found:

[T]his lack of guidance, assistance and objection makes it much less apparent in the Court's mind that Defendants acted in an overly egregious manner. Apparently Defendant [sic] Garrison did arrive prior to the time the 'garage shop' building which he occupied as an *ad hoc* residence was razed, but refused to remove his belongings, expressing his preference to force the county (presumably *via* a lawsuit) to pay him for his belongings.

Thus, the trial court's finding that the individual defendants' conduct was not egregious was based on its assessment of the ALJ's order, the general disrepair of the property including the garage shop, and plaintiffs' actions.

The trial court's conclusion that the individual defendants' conduct was willful was based on its review of the administrative hearing transcript. It cites to pages of the transcript as showing that "it is uncontrovertible" that removal of the garage shop was not authorized by the ALJ's order. Since that transcript is not in the record before this court, we cannot review it. Whatever occurred at that hearing cannot be a basis for this court to evaluate the actions of the individual defendants.

To support its finding of a section 1983 violation, however, the majority states that the "individual defendants improperly razed buildings [sic] under the belief that a lawsuit would be 'cheaper' than according plaintiffs the benefit of the process contemplated under Ordinance No. 3." Maj. op. at 221. This statement is based on the testimony at trial of Lieutenant Ronald Blasko of the Adams County Sheriff's Department. Blasko testified that he had overheard the following conversation between the two individual defendants regarding the garage shop building:

Well, I overheard Mr. Loew—in fact he pointed at a building and asked Mr. Matteson if that building was on the order; and Mr. Matteson replied that it wasn't.

Mr. Loew had instructed him to tear it down, stating "It would be cheaper if he sued me."

Both Matteson and Loew testified at trial and denied that Loew had made the lawsuit statement attributed to him by Blasko. Matteson testified, "That statement was never made." Loew gave similar testimony.

Both Matteson and Loew acknowledged that they had discussed being sued over this matter and that the discussion was within Blasko's hearing. Matteson, who had had several previous encounters with Hibbard in regard to this and other properties, testified that he told Loew that Hibbard frequently threatened to sue Matteson "and have everything I owned." Loew testified that Blasko asked him if he, Blasko, would be sued. Loew said he explained to Blasko that the matter already had been in litigation with respect to the temporary restraining order. Loew also stated:

and I tried to allay his [Blasko's] fears about being personally sued. I said, "We are more likely to be sued than you will be."

The trial court did not resolve the factual dispute about Loew's alleged lawsuit statement. As noted above, although the trial court found that Matteson told Loew that the garage shop was not within the scope of the ALJ's order, it also found that the individual defendants' conduct was not sufficiently egregious to support an award of punitive damages against them. The latter conclusion appears to be an implicit rejection by the trial court of Blasko's testimony on the lawsuit statement.

Despite the lack of trial court findings on this contested issue of fact, the majority credits Blasko's allegation and makes it the key to its finding of section 1983 liability. In my view, it is improper for this court to resolve a disputed issue of fact by crediting the testimony of one witness over that of another. Making a credibility determination in a trial is not the function of an appellate court. "The credibility of witnesses, the sufficiency, probative effect, and weight of evidence, and the inferences and conclusions to be drawn therefrom, are all matters within the province of the trial court and will not be disturbed on review unless clearly erroneous." O'Connor v. Rolfes, 899 P.2d 227, 230 (Colo.App.1994).

Based on the trial court's findings of fact, the individual defendants' conduct cannot fairly be said to shock the conscience. As the trial court stated in finding that the conduct was willful but not egregious, "all of the proceedings here had been contested, tempers had flared, and the decision to proceed was made while the demolition crew was on-site and acting." The individual defendants acted under the heat of the moment, and while their conduct was wrongful, it does not shock the conscience.

I am aware that section 1983 violations sometimes have been found when local officials have defied a court order. See, e.g., Robinson v. City of Seattle, 119 Wash.2d 34, 830 P.2d 318 cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992). But as the Robinson case indicates, a finding of liability under section 1983 in such circumstances occurs only in the most extreme cases. For example, in the Robinson case, Seattle city officials continued to enforce a housing demolition license fee even though that requirement had been held unlawful in two lengthy series of cases in which Seattle was a party. I have found no case in which city officials have been held liable under section 1983 for violation of an administrative order.

Thus, I would conclude that the plaintiffs have not proven a constitutional tort. It may be that the plaintiffs can pursue common law torts such as trespass or conversion against the individual defendants, but, in my view, they have no claim against these defendants under 42 U.S.C. section 1983.

For these reasons, I concur in part and dissent in part from the majority's opinion.

KOURLIS, J., joins in the partial concurrence and dissent.