The STATE of Colorado, Department of Corrections; Marian Norman; and Mike Farrell, Petitioners,

v.

Arthur Moses NIETO, Respondent.

No. 97SC876.

Supreme Court of Colorado, En Banc.

Feb. 14, 2000.

494 

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, Garth C. Lucero, Deputy Attorney General, Timothy R. Arnold, Deputy Attorney General, Jane R. Christman, First Assistant Attorney General, Thomas C. Sullivan, Assistant Attorney General, Civil Litigation Section, Tort Litigation Unit, Denver, Colorado, Attorneys for Petitioners.

Ozer & Ozer, P.C., Robert C. Ozer, Jill C. Harris, Colorado Springs, Colorado, Attorneys for Respondent.

Hall & Evans LLC, Eugene R. Commander, Malcolm S. Mead, Denver, Colorado, Attorneys for Amici Curiae American Consulting Engineers Council of Colorado and Colorado Chapter of the American Institute of Architects.

Robert N. Spencer, Englewood, Colorado, Attorney for Amicus Curiae, Colorado Medical Society.

Treece, Alfrey, Musat & Bosworth, P.C., Michael L. Hutchinson, Denver, Colorado, Attorneys for Amicus Curiae Colorado Defense Lawyers Association.

Justice SCOTT delivered the Opinion of the Court.

Section 13–20–602, 5 C.R.S. (1999), requires a plaintiff to file a certificate of review prior to initiating a civil action for "damages ... based upon the alleged professional negligence of ... a licensed professional." The certificate of review certifies that a plaintiff has consulted "a person who has expertise in the area of the alleged negligent conduct" and that the claims made in the complaint "do not lack substantial justification." § 13–20–602(1)(a), (3)(a)(I) & (II).

In *Nieto v. State*, 952 P.2d 834 (Colo.App. 1997), the Colorado Court of Appeals held that plaintiff Arthur Moses Nieto could prosecute a civil action against the State of Colorado ("State") for damages based on the alleged nursing malpractice of one of its employees, even though Nieto failed to timely file a certificate of review. The court of appeals so held reasoning that the "state defendants," the State and the Department of Corrections (DOC), "are not licensed professionals." *Id.* at 838.

On our review here, we must decide whether a plaintiff who fails to meet the procedural prerequisite of timely filing a certificate of review can nonetheless proceed to litigate his claims of professional negligence under Colorado law. We hold that a plaintiff who fails to file a certificate of review may not pursue such a professional negligence claim. In our view, the Colorado General Assembly intended that section 13–20–602 create a procedural prerequisite requiring the filing of a certificate of review for any claims based on the malpractice of a licensed professional. Furthermore, we hold that dismissal is required in this case whether the plaintiff seeks damages against the "licensed professional named as a party" or seeks damages only against the employer of the licensed professional.

We must also decide whether the Colorado Governmental Immunity Act grants the State immunity from civil suits for damages arising out of the operation of a correctional facility, and whether the complaint filed by Nieto was properly filed to proceed against individual defendants under 42 U.S.C. § 1983 (1994). In answering these two issues, we hold that the State has no such immunity and that the course of proceedings confirms that Nieto properly sought damages for violations of his civil rights against the individual defendants in their personal capacities. Therefore, we hold that, in accordance with our precedent set forth in *County of Adams v. Hibbard*, 918 P.2d 212 (Colo.1996), the court

of appeals correctly held that "the plaintiff sufficiently stated and pursued [42 U.S.C.] § 1983 claims against the individual defendants in their 'personal' or 'individual' capacities." *Nieto*, 952 P.2d at 843. This result is supported by a review of the course of proceedings, which was sufficient to establish that the plaintiff was pursuing, and each individual defendant was opposing, a § 1983 claim made against the state employee in the employee's individual or personal capacity. Under such circumstances, a motion to dismiss suggesting that plaintiff sued state employees or officials only in their official capacity must fail.

Accordingly, we reverse, in part, the judgment of the court of appeals to the extent that it permits a plaintiff to proceed with his claim against the State under a respondeat superior theory for the injury caused by the licensed professional. We do so because in our view, permitting such a plaintiff to ignore this clear prerequisite, which is designed to deter frivolous claims and therefore reduce the costs associated with frivolous actions borne by all citizens, is contrary to the sound public policy decision that led to the statute's adoption.

We note, however, that negligence claims against the employer of an individual who is not a licensed professional and who has allegedly committed negligent acts are not covered by section 13–20–602 and therefore do not require the filing of a such a certificate. Because the State has no immunity for injuries resulting from the operation of a correctional facility, § 24–10–106(1)(b), 7 C.R.S. (1999), we conclude that the State may be held liable for the injury that Nieto suffered as a result of the negligent conduct of unlicensed employees under its control, applying the doctrine of respondeat superior.

## I. Certiorari Review

Our order granting certiorari raised three issues. First, "whether the court of appeals erred in holding that Nieto was not required to file a certificate of review in accordance with section 13–20–602, 5 C.R.S. (1999), in order to proceed with his professional negligence claims against the State defendants." Second, "whether the court of appeals erred in ruling that the State defendants were not immune from liability under section 24–10–106(2) and (3), 7 C.R.S. (1999)." Third, "whether the court of appeals erroneously ruled that the trial court improperly dismissed the claims against the individual defendants brought under 42 U.S.C. § 1983."

Nieto's complaint before the trial court named as defendants the State, the DOC,[1] and individual defendants Marian Norman (Norman), and Mike Farrell (Farrell).[2] In his complaint before the trial court, Nieto alleged that the defendants' conduct caused severe pain and resulted in a disabling medical condition by which he became "permanently hemiparietic, and mentally impaired."

In Count One of his complaint, Nieto claimed that the conduct of defendants Norman, a registered nurse, and Farrell, a prison guard, constituted "deliberate indifference [with respect to Nieto's] serious medical needs" resulting in a "deprivation of . . . life-sustaining medical attention, all in violation of his civil rights and giving rise to a claim under § 1983." Under this count, Nieto asked for damages "in an amount to be determined at trial, *plus exemplary damages.*" (Emphasis added.) In Count Two, Nieto alleged that defendant Norman committed nursing malpractice in her evaluation and treatment of Nieto. Under that count, again he sought damages "in an amount to be determined at trial." In the third count of his complaint, Nieto alleged that all defendants were liable for the negligent conduct of the individual defendants.

## II. Facts and Procedural History

### A. Underlying Facts

On September 29, 1991, Nieto, an inmate in the custody of the DOC, sought treatment at the prison medical clinic for cold and flu

---

1. For purposes of clarity and brevity, the State and the DOC shall be referred to collectively as the "State."

2. Defendants Norman and Farrell shall be referred to collectively as the "individual defendants." Collectively, all defendants are referred to as the "defendants."

symptoms. The nurse on duty treated him for a cold based on the symptoms and returned him to his cell.

On October 2, 1991, Nieto returned to the clinic and was seen by defendant Norman, a registered nurse and the clinic's medical coordinator. Norman examined Nieto and continued the cold and flu protocol.

Nieto returned to the clinic later in the week with a puffy eye and continued worsening symptoms. Upon seeing him, Norman ordered Nieto to leave and indicated that if he returned to the clinic, he would be disciplined. On October 6, 1991, Nieto again returned to the clinic and reported to the nurse on duty that he was experiencing night fevers and right-sided headaches. Nieto told the nurse that he believed he was having a stroke. The nurse on duty called a physician's assistant to describe Nieto's "lack of symptoms." The physician's assistant prescribed an antibiotic and a decongestant for a sinus infection, and instructed the nurse to recheck Nieto the following day and make an appointment for him to visit the physician's assistant on October 9, 1991. However, Nieto did not return for either appointment.

Nieto's condition deteriorated substantially between October 6 and October 9. On the evening of October 6, Nieto's cellmate noticed that Nieto's eye was almost swollen shut, and notified defendant Farrell, a prison guard, of his condition. Farrell responded that Nieto should put hot compresses on his eye. Nieto returned to Farrell requesting help at least two more times. Nonetheless, Farrell refused to assist him. During the next three days, Nieto was dizzy and weak to the point of being bedridden.

On October 9, Nieto was found unconscious in his cell, incontinent, with his right eye bulging from its socket and discharging green pus. Nieto was taken to the Delta County Memorial Hospital and was diagnosed with a severe sinus infection. Due to the severity of the infection, Nieto was transferred to St. Mary's Hospital where it was determined that the sinus infection had spread to his right eye, the base of his brain, and the right frontal lobe of his brain.

During the next two months, Nieto underwent three brain surgeries, two sinus surgeries, and one eye surgery. Nieto suffered a stroke as a result of the infection. Today, Nieto is permanently paralyzed on the left side of his body.

### B. Procedural History

During October 1993, Nieto initiated this action by filing a complaint in the Denver District Court (trial court). As originally filed, the complaint named defendant Norman and defendant Farrell in claims under § 1983, alleging violations of Nieto's civil rights; named nurse Norman, a licensed professional, as a defendant under a professional malpractice claim; and sought to hold the State and the individual defendants liable for negligence.

In response to several motions and by its order dated February 18, 1994, the trial court dismissed Nieto's civil rights claim under § 1983. The trial court concluded that defendant Farrell, a DOC guard, was a peace officer subject to the one-year statute of limitations under section 13–80–103, 5 C.R.S. (1999), and that Nieto failed to allege acts performed outside of either defendants' official capacity. Thus, the trial court reasoned, "none of the defendants are 'persons' under § 1983."

On March 24, 1994, the State filed a motion to compel the filing of a certificate of review, or in the alternative, to dismiss the complaint, noting that plaintiff had failed to file a certificate of review with his complaint alleging nursing malpractice and naming nurse Norman. On May 9, 1994, the trial court dismissed the professional negligence or nursing malpractice claim, finding that the "mandatory" certificate of review required by section 13–20–602, "was not timely filed." After the dismissal of the negligence claims and § 1983 claims, the State filed its motion for summary judgment. By order dated February 13, 1996, the trial court denied the State's motion for summary judgment. The trial court concluded that, while it had dismissed the nursing malpractice claim as to defendant Norman pursuant to *Martinez v. Badis*, 842 P.2d 245 (Colo.1992), the State "can be held liable pursuant to the theory of

respondeat superior for the acts of nurses employed by [the State]" under the negligence claim.[3] The trial court ruled that the failure to file a timely certificate of review "does not require dismissal of negligence claims against the remaining defendants merely because recovery might require proof of professional negligence."

After a trial on the remaining negligence claim, the jury rendered a verdict against the State. However, the jury, using the verdict forms provided, did not indicate whether its liability determination was based on the conduct of defendant Farrell or what amount of damages was attributable to Farrell's conduct. The jury awarded Nieto $1.8 million, finding the State 80% at fault and Nieto 20% at fault.[4] The trial court reduced the damage award to $150,000 pursuant to section 24–10–114(1)(b), 7 C.R.S. (1999), and entered judgment against the State in the amount of $150,000.[5]

The State appealed to the court of appeals, alleging that the trial court erred in failing to dismiss the negligence claim. The State argued that because Nieto did not file a timely certificate of review pursuant to section 13–20–602, Nieto's entire complaint must be dismissed. In the alternative, the State argued that it is immune from liability pursuant to the Colorado Governmental Immunity Act (GIA), section 24–10–106, 7 C.R.S. (1999), and that the State cannot be held liable under the doctrine of respondeat superior. Nieto cross-appealed. Nieto argued that he had not sued the individual defendants in their official capacities, but rather had sued them as individuals, pursuant to 42 U.S.C. § 1983. Thus, Nieto appealed the dismissal of the claims against the individual defendants, Norman and Farrell, for violations of his civil rights under § 1983.

The court of appeals affirmed in part and reversed in part. *See Nieto v. State*, 952 P.2d 834. The court of appeals held that the trial court did not err when it refused to dismiss the negligence claim against the State because "the trial court properly determined that [section] 13–20–602 did not require plaintiff to file a certificate of review to proceed on his claim solely against the state defendants." *Id.* at 839. The court of appeals also held that because "the operation of a correctional facility ... includes the provision of medical care necessary for basic health," the trial court "did not err in refusing to dismiss plaintiff's claim based on governmental immunity." *Id.* The court of appeals reasoned that "the state [can] be held liable under *respondeat superior* for all damages resulting from the negligence of [its] employees." *Id.* at 841. Therefore, the court of appeals reversed the trial court's dismissal of Nieto's civil rights claim and directed the trial court to reinstate his § 1983 claim, concluding that "considering the complaint in context and as a whole, together with the course of proceedings, plaintiff sufficiently stated and pursued § 1983 claim[s] against the individual defendants in their 'personal' or 'individual' capacities." *Id.* at 843.

---

3. The trial court submitted 26 instructions to the jury on the State's liability for negligence. In instruction # 10, the jury was instructed that "[t]he nurses and employees of the Delta Correctional Center were the agents of the ... State." In instruction # 16, the jury was instructed:

A nurse is not negligent when the nurse does an act which reasonably careful nurses would do.

To determine whether a nurse's conduct was reasonably careful, that conduct must be measured against what a nurse having and using that knowledge and skill of nurses practicing in the same field of practice, in the same or similar locality, at the same time, would or would not have done under the same or similar circumstances.

Thus, under these instructions, the jury was permitted to hold the State accountable for the professional negligence of defendant Norman.

The jury verdict forms did not apportion the damages for defendant Norman and other agents of the State.

4. Special Verdict Form B indicates that the jury found that the State was negligent and caused Nieto's "injuries, damages and losses." The jury found that the total amount of damages for "non-economic losses or injuries" to be $1 million. The jury found the total amount of damages for economic losses to be $200,000. In addition, the jury awarded damages of $600,000 for "physical impairment or disfigurement." Thus, the damages amount against the State was $1.8 million.

5. Section 24–10–114(1)(b) of the Governmental Immunity Act places a limitation of $150,000 against government officials for any injury to one person in any single occurrence.

In light of the judgment of the court of appeals, the State and individual defendants petitioned this court for certiorari. Because of the importance of the issues raised below, we granted the petition as to three issues raised and set the case for briefing and oral argument.

We granted certiorari to determine whether the court of appeals erroneously held that the State may be held liable under a respondeat superior theory of liability for nursing malpractice when a plaintiff fails to file a certificate of review as required by section 13–20–602. We also must decide whether the court of appeals erred in holding that, despite the GIA, the State is not immune from liability for acts arising out of the operation of a correctional facility, pursuant to section 24–10–106. Finally, we must determine whether the court of appeals erred in holding that the trial court improperly dismissed the § 1983 claims against the individual defendants. We will address each issue in turn.

### III. Section 13–20–602 and the Certificate of Review

We begin our analysis of the questions before us with the State's contention that it cannot be liable under the doctrine of respondeat superior. The State reasons that because Nieto's claim is based upon the professional malpractice of nurse Norman, section 13–20–602 requires the filing of a certificate of review. Therefore, the State argues that Nieto's failure to timely file the certificate of review is fatal. Nieto, relying upon the judgment of the court of appeals, counters the State's argument by asserting that section 13–20–602 does not require the filing of a certificate of review in this case because his claim against the licensed professional was dismissed. According to Nieto's argument here and before the court of appeals, his action is not barred by section 13–20–602 because Nieto's remaining malpractice action only sought relief from the State, the employer of his tortfeasors. Our resolution of this issue, then, is controlled by the General Assembly's intent and our construction of section 13–20–602.

In construing our statutes, we are first obligated to look to the plain meaning of the language of the controlling statute, here section 13–20–602, which applies to the nursing malpractice claim made in this case. However, we find the words used in section 13–20–602 unclear and ambiguous. Confronted with this uncertainty or ambiguity, we turn to our canons of statutory construction. Under those canons, we resort to several rules intended to guide judicial deference to the workings of the legislature.

#### A. Canons of Statutory Construction

██ When construing a statute, courts must ascertain and give effect to the intent of the General Assembly, *see Walker v. People,* 932 P.2d 303, 309 (Colo.1997), and must refrain from rendering judgments that are inconsistent with that intent. *See Farmers Ins. Exch. v. Bill Boom, Inc.,* 961 P.2d 465, 469 (Colo.1998). To determine legislative intent, we therefore look first to the plain language of the statute. *See Vaughan v. McMinn,* 945 P.2d 404, 408 (Colo.1997); *City of Westminster v. Dogan Constr. Co.,* 930 P.2d 585, 590 (Colo.1997). If courts can give effect to the ordinary meaning of words used by the legislature, the statute should be construed as written, giving full effect to the words chosen, as it is presumed that the General Assembly meant what it clearly said. *See Askew v. Industrial Claim Appeals Office,* 927 P.2d 1333, 1337 (Colo.1996); *PDM Molding, Inc. v. Stanberg,* 898 P.2d 542, 545 (Colo.1995); *see also* § 2–4–101, 1 C.R.S. (1999) ("Words and phrases shall be read in context and construed according to ... common usage. Words and phrases that have acquired a technical or particular meaning whether by legislative definition or otherwise, shall be construed accordingly."). If the statutory language is clear and unambiguous, courts need not look further. *See Town of Superior v. Midcities Co.,* 933 P.2d 596, 600 (Colo.1997); *Boulder County Bd. of Equalization v. M.D.C. Constr. Co.,* 830 P.2d 975, 980 (Colo.1992).

██ However, where the words chosen by the legislature are unclear in their common understanding, or capable of two or more constructions leading to different results, the

statute is ambiguous. *See Colby v. Progressive Cas. Ins. Co.*, 928 P.2d 1298, 1302 (Colo. 1996). Where a statute is ambiguous so that the words chosen do not inexorably lead to a single result, resort to the legislative history to ascertain legislative intent is appropriate. *See* § 2–4–203, 1 C.R.S. (1999); *see, e.g., Colby*, 928 P.2d at 1302.

"If a statute is ambiguous, the court, in determining the intention of the general assembly, may consider among other matters: (a) [t]he object sought to be attained; ... (c) [t]he legislative history; ... (e) [t]he consequences of a particular construction; ... [and] (g) [t]he legislative declaration or purpose." § 2–4–203(1)(a), (c), (e), and (g), 1 C.R.S. (1999); *see also Rowe v. People*, 856 P.2d 486, 489 (Colo.1993) ("If a statute is ambiguous, we may determine the intent of the General Assembly by considering the statute's legislative history, the state of the law prior to the legislative enactment, the problem addressed by the legislation, and the statutory remedy created to cure the problem.").

▉ To reasonably effectuate the legislative intent, a statute must be read and considered as a whole and "should be interpreted so as to give consistent, harmonious, and sensible effect to all its parts." *People v. District Court*, 713 P.2d 918, 921 (Colo.1986); *see also Martinez v. Continental Enters.*, 730 P.2d 308, 315 (Colo.1986); *Colorado Dep't of Soc. Servs. v. Board of County Comm'rs*, 697 P.2d 1, 23 (Colo.1985).

▉ A statute must also be construed to further the legislative intent represented by the entire statutory scheme. *See Allen v. Charnes*, 674 P.2d 378, 381 (Colo.1984); *Public Employees Retirement Ass'n v. Greene*, 195 Colo. 575, 577, 580 P.2d 385, 387 (1978). It is presumed that "[t]he entire statute is intended to be effective" and "[a] just and reasonable result is intended." § 2–4–201(1)(b), (c).

▉ Further, in construing a statute, we must seek to avoid an interpretation that leads to an absurd result. *See Ingram v. Cooper*, 698 P.2d 1314, 1315 (Colo.1985); *see also* § 2–4–201(1)(c) ("A just and reasonable result is intended."); *AviComm, Inc. v. Colo-*

*rado Pub. Utils. Comm'n*, 955 P.2d 1023, 1031 (Colo.1998) ("[T]he intention of the legislature will prevail over a literal interpretation of the statute that leads to an absurd result."). Statutory interpretation leading to an absurd result will not be followed. *See Hall v. Walter*, 969 P.2d 224, 229 (Colo.1998).

When the statutory language lends itself to alternative constructions and its intended scope is unclear, a court may look to pertinent legislative history to determine the purpose of the legislation. *See* § 2–4–203(1)(c), 1 C.R.S. (1999) (stating that the court may consider the legislative history in determining the intention of the General Assembly); *Aetna Cas. & Sur. Co. v. McMichael*, 906 P.2d 92, 97 (Colo.1995).

In any event, the ultimate goal is to determine and give effect to the intent of the General Assembly; in doing so, a reviewing court must follow the statutory construction that best effectuates the intent of the General Assembly and the purposes of the legislative scheme. *See Martin v. Montezuma–Cortez Sch. Dist. RE–1*, 841 P.2d 237, 246 (Colo.1992).

### B. Section 13–20–602 is Ambiguous

Nieto concedes, and the State agrees, that section 13–20–602 requires a plaintiff to file a certificate of review in a professional negligence action when a licensed professional is named as a party defendant. Where the parties disagree is whether a certificate of review is required in cases that are based upon the malpractice of a licensed professional, but where a plaintiff does not seek damages from the licensed professional and instead seeks damages from the employer of the licensed professional. Thus, it is the application of section 13–20–602 to the facts of this case that give rise to the dispute before us.

At the time the complaint was filed, section 13–20–602, 6A C.R.S. (1993), provided in relevant part:

(1) In every action for damages or indemnity based upon the alleged professional negligence of a licensed professional, the plaintiff's or complainant's attorney shall file with the court a certificate of review,

for each licensed professional named as a party, as specified in subsection (3) of this section, within sixty days after the service of the complaint, counterclaim, or cross claim against such licensed professional unless the court determines that a longer period is necessary for good cause shown.

. . . .

(4) The failure to file a certificate of review in accordance with this section shall result in the dismissal of the complaint, counterclaim, or cross claim.

(Subsequently amended in 1995, ch. 133, sec. 6, § 13–20–602, 1995 Colo. Sess. Laws 482, 485 (H.B.95–1182), and in 1998, ch. 165, sec. 1, § 13–20–602, 1998 Colo. Sess. Laws 487, 487–88 (H.B.98–1372).)

■ The language of the section 13–20–602 is subject to more than one interpretation. On one hand, a person can reasonably conclude that the certificate of review is required because, as set forth in the statute, any time an "action for damages [is] based upon the alleged professional negligence of a licensed professional." On the other hand, based on other words in the same statutory provision, one might conclude, as did the court of appeals, that the certificate of review is *not* required because there are no "licensed professional[s] named as a party." *See Nieto,* 952 P.2d at 838 (Nieto need not file the certificate of review because "the State defendants are not licensed professionals.").

Thus, the statutory provision can be reasonably applied to reach two distinct and opposing results, and we conclude it is ambiguous. When a statute is ambiguous, we are directed by the General Assembly to turn to certain "aids in construction," including the legislative history, the General Assembly's declaration of purpose, and the object or purpose sought to be attained. *See* § 2–4–203; *see also Rowe,* 856 P.2d at 486.

## C. Aids to Construing Ambiguous Statutes

■ "Legislative intent is the polestar of statutory construction." *Schubert v. People,* 698 P.2d 788, 793 (Colo.1985). Where a statute is ambiguous, a court may consider several factors in discerning the intent of the legislature, including the legislative history, the General Assembly's declaration of purpose, and the object sought to be attained. *See* § 2–4–203 (stating that in determining the intention of the General Assembly, the court may consider the object sought to be attained, the legislative history, and the legislative declaration or purpose); *see also Charnes v. Boom,* 766 P.2d 665, 667 (Colo. 1988) (stating that the intent of the General Assembly can be determined by considering the statute's legislative history, the state of the law prior to the legislative enactment, the problem addressed by the legislation, and the statutory remedy created to cure the problem).

■ Applying these principles, we reject the statutory construction adopted by the court of appeals under which a certificate of review would not be required merely because the employee, upon whose malpractice the respondeat superior claim is based, is not named as a party to the action. Our conclusion finds support in the legislative history and the legislative purpose.

### 1. Legislative Purpose

As context for the language used in section 13–20–602, the General Assembly declared its purpose in section 13–20–601. In section 601, the General Assembly stated that "the certificate of review requirement should be utilized in civil actions for negligence brought against those professionals who are licensed by the [S]tate." There, the legislature spoke in broad terms, indicating an intent that it was addressing *all* civil actions for professional negligence.

■ We have previously established that the purpose of section 13–20–602 is to demonstrate that the plaintiff has consulted a person who has expertise and that such person has concluded that the plaintiff's claim is meritorious. *See Shelton v. Penrose/St. Francis Healthcare Sys.,* 984 P.2d 623, 628 (Colo.1999). Specifically, the "statute aids in avoiding unnecessary time and costs in defending professional negligence claims, weeding out frivolous claims and putting a defendant on notice of the development of the theory of the case." *Id.* (citing *Martinez v. Badis,* 842 P.2d 245, 250 (Colo.1992)).

In her dissenting opinion in *Nieto v. State,* Judge Davidson set forth the harm or problem the provision was designed to address:

In the later 1980's, numerous state legislatures reacted to a perceived rise in frivolous malpractice claims by enacting statutes that required plaintiffs to file certificate of review or affidavits in order to ensure that such claims were, or could be, supported by an expert opinion that the standard of care in the professions had been violated. *See, e.g.,* Ga.Code Ann. § 9–11–9.1(a) (1987) ("in any action for damages alleging professional malpractice, the plaintiff shall be required to file with the complaint an affidavit of an expert"); *Dozier v. Clayton County Hosp. Authority,* 206 Ga.App. 62, 424 S.E.2d 632 (1992).

Section 13–20–601, et. seq. C.R.S.1992, is the version enacted in Colorado. It applies the certificate of review filing requirements to "every action for damages or indemnity based upon the alleged professional negligence [of a licensed professional]." Section 13–20–602(1), C.R.S.1997.

952 P.2d at 845.

As Judge Davidson noted, in *Martinez v. Badis,* 842 P.2d at 251, we had previously acknowledged that the purpose of section 13–20–602 was "to prevent the filing of frivolous actions." *Nieto,* 952 P.2d at 845. The problem or harm the legislature sought to correct was "the prevention of baseless professional malpractice actions," *id.,* at 846 (Davidson, J., dissenting), and to reduce the resultant costs to society through increased insurance premiums attributed to the expenses otherwise associated with such claims. The statutory remedy the General Assembly created to cure this problem was the mandatory certificate of review set forth in section 13–20–602.

In our view, this legislative purpose militates against a reading of section 13–20–602 that permits a plaintiff to avoid the filing of a certificate of review when his claims are based on the negligence of a licensed profes-

sional, even if the plaintiff elects not to name the professional as a party. The purpose instead calls for a broad reading and application of such a requirement to reach all cases "based upon the alleged professional negligence of a licensed professional." § 13–20–602.

### 2. Legislative History

A review of the legislative history further supports the State's argument today. The 1987 debates associated with the enactment of section 13–20–602 also illustrate that the purpose of the statute was "the elimination of frivolous lawsuits and the expense associated with meritless claims." The sponsor of the bill, Representative Bath, remarked that "Bill 1201 is a relatively straightforward effort to cut down on frivolous lawsuits and really, to supplement some of the legislation that we've had in previous sessions to prevent lawyers from bringing lawsuits against professionals that are without foundation." *Hearing on H.B. Before the House Judiciary Committee,* 56th Gen. Assembly, 1st Reg. Sess. (Audio Hearing Tape Mar. 3, 1987) (statement of Rep. Bath, sponsor). Similarly, Neil Hillyard, president of the Colorado Trial Lawyers Association, who originally proposed the certification requirement to Representative Bath and who was a key drafter of the language of the bill, testified, "[The bill] is directed to one thing. It is directed to try to make an early determination in a case that the case has merit or if the case is frivolous, and build it into the procedure." *Id.* (statement of Neil Hillyard, president, Colorado Trial Lawyers Association).

These statements aid in demonstrating the purpose of the statute:[6] to provide an initial screening procedure for lawsuits founded upon professional negligence in an effort to eliminate, at the outset, meritless claims. Nothing in the legislative purpose supports an exception to this rather straight-forward requirement or even im-

---

**6.** By contrast, the 1995 amendment of the statute and the legislative history of that amendment do not aid our analysis, as the General Assembly that amended the statute is not the same General Assembly that enacted the statute that we construe here. We cannot infer the intent of an earlier legislature from the views of a subsequent one. *See United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 348–49, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); *United States v. Price,* 361 U.S. 304, 312, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960).

plies a distinction between the interests of an individual professional and the interests of that professional's employer in eliminating the occurrence of frivolous lawsuits. Our survey of the legislative debates fails to disclose a basis for any exception to or limitation upon a broad reading of the certificate of review requirement.

The 1989 debates resulted in the addition of the phrase, "for each licensed professional named as a party," to the statute as originally enacted. *See* ch. 129, sec. 1, § 13–20–602, 1989 Colo. Sess. Laws 750. In addition to reiterating the intent of the statute to avoid frivolous claims, Representative Prinster discussed the rationale behind the addition of the clause:

> [I]n many cases involving professional neglect, there are multiple defendants and some of them can be different professionals that have problems with, for example, a construction thing. You might have a professional civil engineer, you might have a professional electrical engineer, you might have a professional architect. So what the case would say, since some of those would be reviewed based on different qualifications, that there would be a certificate filed for each professional, instead of having them considered on one.
>
> . . . .
>
> I think that the purpose of the Bill is to kind of fine tune the intent of the current statute and it's to afford a meaningful pre-screening to weed out meritless complaints against alleged professional negligence.

*Hearing on H.B. 1284 Before the House Judiciary Committee,* 57th Gen. Assembly, 1st Reg. Sess. (Audio Hearing Tape Feb. 16, 1989) (statement of Rep. Prinster, sponsor).

Also testifying on behalf of the amendment, the general counsel for Copic Insurance Company, George Dikeou, stated:

> [The amendment] requires that the certificate of review be filed for each defendant. One of the problems that has arisen historically is that a certificate will be filed for one defendant and then, as other defendants are added, (inaudible) additional certificates are not filed so you have situations where there have historically been frivolous claims against additional defendants.

> And this is really designed to try to eliminate that by requiring the certificate for each defendant.

*Id.* (statement of George Dikeou, general counsel, Copic Insurance Company).

These statements clearly establish that by adopting such language, the General Assembly sought to eliminate any situations in which a claimant could avoid the certificate requirement. Based on our review of the legislative history, it is clear that the certificate requirement was not only to apply to actions in which licensed professionals are named as a party, but also to claims based on the negligence of licensed professional.

■ Under the second count of his complaint, Nieto asserted a nursing malpractice claim against defendant Norman in her personal capacity. Specifically, he claimed that "[d]uring the course of Defendant NORMAN's evaluation and treatment of Plaintiff, Defendant NORMAN failed to adhere to a reasonable and acceptable standard of nursing care and was negligent in her evaluation and treatment of Plaintiff in numerous respects. . . ." Thus, while the court of appeals is correct in stating that neither the State nor the DOC can be characterized as a licensed professional, Nieto's claim for nursing malpractice falls squarely within the class of claims covered by section 13–20–602. Therefore, considering the declaration of the legislative purpose and the legislative history of section 13–20–602, in our view, Nieto was required to file a certificate of review when he filed suit against the State for the negligence of defendant Norman.

Our decision in *Martinez v. Badis,* 842 P.2d 245 (Colo.1992), supports our conclusion. In *Martinez,* the plaintiffs alleged that during the course of a purchase of a business and real property from defendants, they were misinformed about critical aspects of the transaction and as a result suffered $350,000 in damages. *See id.* at 247. Among the claims for relief was breach of contract. *See id.* Defendants successfully moved to dismiss plaintiffs' claims based on plaintiffs' failure to file a certificate of review within the required time period. *See id.* at 248. On appeal, we held that the certificate of review

requirement applied only to professional negligence claims that required expert testimony to establish a prima facie case. *See id.* at 249–51. We also held that the requirement encompassed some claims of breach of fiduciary duty and breach of contract, reasoning that those claims are actually *"based upon"* professional negligence. *Id.* at 251 (emphasis added).

■■■ Further, according to section 13–20–602(4), "[t]he failure to file a certificate of review in accordance with this section shall result in the dismissal of the complaint, counterclaim, or cross claim." A reading of this provision in the first instance might cause one to suggest that the entire complaint, including claims not based on the professional negligence of a licensed professional, must be dismissed. However, we do not read this language to require courts to take such action. We interpret this language to mean only that any claim in a complaint, counterclaim, or cross claim "based upon the alleged professional negligence of a licensed professional" must be dismissed. Stated another way, all counts based on the professional negligence or the malpractice of a licensed professional, and only those claims, must be dismissed.

However, other claims made in the same complaint but not based on conduct amounting to professional malpractice or negligence should not be affected by the failure to file the certificate of review. *See Martinez,* 842 P.2d at 249–50 (in construing an earlier version of subsection 13–20–602(4), we held the certificate of review did not necessarily apply to breach of contract claims or other claims not based on the malpractice of a licensed professional).

■■■ In interpreting the statute, we must presume that the General Assembly intended a just and reasonable result and must seek to avoid an interpretation that leads to an absurd result. *See Smith v. Zufelt,* 880 P.2d 1178, 1185 (Colo.1994). An interpretation that defeats the legislative intent or leads to an absurd result will not be followed. *See People v. Bland,* 884 P.2d 312, 318 (Colo. 1994); *see also Hall v. Walter,* 969 P.2d 224, 229 (Colo.1998). Hence, although we dismiss the claim against the State because of Nieto's

failure to file the certificate of review regarding nursing malpractice, we find no basis in the statute requiring the dismissal of unrelated claims in the complaint, that is, those claims not "based upon alleged professional negligence of a licensed professional." § 13–20–602, 6A C.R.S. (1993). Thus, we agree with the court of appeals that Nieto's claims under § 1983 as to the conduct of either defendant Norman or defendant Farrell should not be dismissed due to Nieto's failure to file the mandatory certificate. To reach the opposite result and to construe the statute as requiring dismissal of claims unrelated to the professional malpractice due to the failure to file the certificate of review would lead to an absurd result.

Accordingly, we conclude that the legislative declaration or purpose and the legislative history concur to affirm that the intent of the General Assembly was simply to require a certificate of review for claims "based upon ... professional negligence."

### D. Matters Beyond the Scope of this Appeal

■■■ Finally, in their briefs and argument before us, petitioners contend that the State cannot be held liable due to our corporate practice of medicine doctrine. We need not and do not reach petitioners' assertion that the State's liability is precluded by the corporate practice of medicine doctrine, as we denied certiorari on that issue in the petition for certiorari. *See Hibbard,* 918 P.2d at 216 (issues raised in a petition for certiorari but which are denied and not included in the order granting certiorari generally will not be addressed by the supreme court).

### IV. Governmental Immunity Act

The State next asserts that the State defendants are immune from liability pursuant to the GIA, in particular section 24–10–106(2) and (3). According to petitioners, the State cannot be held accountable because the individual defendants as state employees, are immune from liability. In addition, the State claims immunity because, it argues, the medical services provided to Nieto were not rendered in the course of the operation of a

correctional facility, pursuant to section 24–10–106(1)(b). We disagree.

### A. Statutes Granting Immunity

Since 1971, governmental or sovereign immunity is no longer a part of our common law. *See Evans v. Board of County Comm'rs,* 174 Colo. 97, 105, 482 P.2d 968, 972 (1971). Statutes granting immunity are in derogation of common law and, hence, must be strictly construed. *See City & County of Denver v. Gallegos,* 916 P.2d 509, 510 (Colo. 1996); *Bertrand v. Board of County Comm'rs,* 872 P.2d 223, 226 (Colo.1994). Nevertheless, our primary task in construing a statute is to determine and give effect to the intent of the legislature. *See Gallegos,* 916 P.2d at 511. To determine the legislative intent, we again look first to the statutory language, giving words and phrases their plain and ordinary meaning. *See id.*

In applying these rules, we recognize that the General Assembly stated in the legislative declaration to the GIA that public entities should be liable "only to such an extent and subject to such conditions as are provided by this article." § 24–10–102, 7 C.R.S. (1998). Recently, we stated that "the [GIA's] waiver provisions are entitled to deferential construction in favor of victims injured by the negligence of governmental agents, while immunity provisions are subject to strict construction." *Walton v. Colorado,* 968 P.2d 636, 643 (Colo.1998).

Section 24–10–106 provides, in relevant part:

(2) Nothing in this section or in section 24–10–104 shall be construed to constitute a waiver of sovereign immunity where the injury arises from the act, or failure to act, of a public employee where the act is the type of act for which the public employee would be or heretofore has been personally immune from liability.

(3) In addition to the immunity provided in subsection (1) of this section, a public entity shall also have the same immunity as a public employee for any act or failure to act for which a public employee would be or heretofore has been personally immune from liability.

Subsection (2) states that the sovereign immunity of a public entity is not "waive[d]" when it is derived from the personal immunity of a public employee. Subsection (3) provides that a public entity has the same immunity from liability as a public employee for any act or failure to act for which the public employee would be or has been personally immune from liability. The State argues that it is immune from liability for the acts of its employees here because those public employees are themselves personally immune from liability. Because we conclude that the individual defendants are not immune from liability, we disagree.

Section 24–10–118(2), 7 C.R.S. (1999), provides:

A public employee shall be immune from liability in any claim for injury ... which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment unless the act or omission causing such injury was willful and wanton; *except that no such immunity may be asserted in an action for injuries resulting from the circumstances specified in section 24–10–106(1).*

(Emphasis added.) Section 24–10–106(1)(b), in turn, provides that "[s]overeign immunity is waived by a public entity in an action for injuries resulting from ... the operation of any ... correctional facility."

The term "operation" is defined in section 24–10–103(3)(a), 7 C.R.S. (1999), as "the act or omission of a public entity or public employee in the exercise and performance of the powers, duties, and functions vested in them by law" with respect to the purpose of the facility.

### B. Section 24–10–106 Does Not Grant Defendants Immunity

The State argues that because the trial court dismissed the individual defendants from the suit by virtue of affirmative defenses, the individual defendants are immune. Petitioners also assert that the individual defendants are immune because they were

not named as defendants and because Nieto did not file a certificate of review. These assertions misinterpret the concept of immunity.

██ A person or entity is not "immune" from suit merely because that person or entity asserts a successful · affirmative defense. *See Wyatt v. Cole,* 504 U.S. 158, 167 n. 2, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) (noting that while a defense entitles an individual to some protection from liability, he is not entitled to immunity from suit). Rather, immunity from suit means that a plaintiff cannot legally file a lawsuit naming that person or entity as a defendant. *See* § 24–10–108, 7 C.R.S. (1999) (providing that sovereign immunity shall be a bar to any action against a public entity); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (recognizing that an entitlement not to stand trial or face other burdens of litigation is an *immunity from suit* rather than a mere defense to liability). Immunity means that the person or entity is incapable of being sued, regardless of fault or wrongdoing. *See Harlow,* 457 U.S. at 818, 102 S.Ct. 2727; *see also Richardson v. McKnight,* 521 U.S. 399, 403, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997) (stating that a legal defense may well involve "the essence of the wrong," while an immunity frees one who enjoys it from a lawsuit whether or not he acted wrongly).

██ In contrast, an affirmative defense is a legal argument that a defendant, who is capable of being sued, may assert to require the dismissal of a claim or to prevail at trial. *See Black's Law Dictionary* 60 (6th ed.1990) (defining affirmative defense as a matter asserted by the defendant in the pleadings which, assuming the complaint to be true, constitutes a defense to it). Similarly, merely because a plaintiff has chosen not to name a person or to pursue a claim against that person does not render that person "immune." At most, that person is lucky, but luck does not constitute immunity.

██ Here, the negligent acts and omissions of defendants Norman and Farrell were committed in the course of operating a correctional facility. These public employees, Norman and Farrell, are not immune from liability pursuant to sections 24–10–118(2) and 24–10–106(1).

██ Therefore, we conclude that the individual defendants were not immune from liability. Moreover, because the General Assembly has not established immunity for the State from acts committed in the course of the operation of the State's correctional facilities, the State is not immune under the GIA, pursuant to section 24–10–106.

## V. 42 U.S.C. § 1983

██ Finally, petitioners contend that Nieto's § 1983 claims against the individual defendants should be barred and that the court of appeals erred in reversing the trial court's dismissal of those claims. Specifically, petitioners contend that because Nieto's complaint named Norman and Farrell in their official capacities, and because Nieto made no effort to amend the complaint, Nieto has waived his right to assert this issue on appeal. We disagree.

### A. Claims in an Employee's Official Capacity

42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

██ In order to state a claim for relief under § 1983, a plaintiff need only allege that: (1) the defendant acted under color of state law; and (2) the defendant's conduct deprived the plaintiff of federal rights. *See Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980).

██ State officials may be sued in their individual capacities for damages under § 1983, *see Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Wilk-*

*erson v. State,* 830 P.2d 1121, 1125 (Colo.App. 1992); however, official-capacity damages suits are treated as suits against the entity. *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). There is no difference between suing a state employee in his or her official capacity and suing the state. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

▇ However, state employees sued for money damages in their official capacities are not "persons" for purposes of § 1983. *See id.* at 71, 109 S.Ct. 2304; *see also Freedom from Religion Found., Inc. v. Romer,* 921 P.2d 84, 89 (Colo.App.1996). Therefore, "although state officials literally are persons," when a plaintiff sues a state official in his or her official capacity, he is actually suing the official's office. *See Wigger v. McKee,* 809 P.2d 999, 1004 (Colo.App.1990) (suit against officer in official capacity is no different than suit against state itself).

### B. Claims in an Employee's Individual Capacity

In the first cause of action of his complaint, Nieto alleges that defendants Norman and Farrell violated § 1983 and states:

> Each and every of the acts of Defendants [Norman and Farrell] alleged herein were done by Defendants, and each of them, *not as individuals,* but under the cover and pretense of the statutes, regulations, customs and usages of the State of Colorado, Department of Corrections, *and under the authority of their office as officials and employees of said Colorado Department of Corrections.*

(Emphasis added.)

On its face, without careful review, Nieto's complaint may appear technically to state a claim against defendants Norman and Farrell, "not as individuals," but "as officials" of Colorado. However, we look to the entire complaint and the proceedings below. *See Hibbard,* 918 P.2d at 215. We first note, however, that the United States Supreme Court has rejected the application of strict pleading requirements to § 1983 claims. *See Leatherman v. Tarrant County Narcotics*

*Intelligence Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). We have also refused to subject § 1983 actions to strict pleading standards. *See Hibbard,* 918 P.2d at 215.

Of course, it "would be preferable for the plaintiff to be specific in the first instance to avoid any ambiguity." *Hafer,* 502 U.S. at 24 n*, 112 S.Ct. 358. Nonetheless, where such niceties of form are not present, other provisions in the complaint may be insightful.

▇ Generally, where state officials are named in a complaint that seeks damages under 42 U.S.C. § 1983, it is presumed that the officials are being sued in their individual capacities. *See Price v. Akaka,* 928 F.2d 824, 828 (9th Cir.1990), *cert. denied,* 502 U.S. 967, 112 S.Ct. 436, 116 L.Ed.2d 455 (1991). Here, in Count One of the complaint, in addition to asserting claims for violations of his civil rights, Nieto plainly seeks "exemplary damages." Exemplary damages are a form of damages not available to plaintiffs who are suing the state, but available when charging individuals. Thus, this language militates against the result that petitioners assert.

▇ Furthermore, while the underscored language in the complaint may be interpreted to mean that Nieto sued the individual defendants in their official capacities, we have stated that such language, alone, does not establish in which capacity the defendants were being sued. *See Hibbard,* 918 P.2d at 215. Rather, "when a complaint does not clearly specify whether officials are sued personally, in their official capacity, or both, 'the course of the proceedings' usually establishes the liability sought to be imposed." *Id.* at 216 (quoting *Kentucky v. Graham,* 473 U.S. 159, 167 n. 4, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)); *see also Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) (requiring courts to examine the pleadings and the "course of proceedings" to determine whether an official is named in his personal or official capacity).

In *Hibbard,* a claim was brought against individual defendants, the county attorney and the assistant county attorney, for unauthorized destruction of property under 42 U.S.C. § 1983. While the complaint stated

that the acts were done by defendants "not as individuals, but under the color and pretense of the ordinances," we held that the action was against the defendants in both their official and individual capacities. *See Hibbard,* 918 P.2d at 216. We noted that the plaintiffs alleged the "color of law" to satisfy civil rights pleading requirements. *See id.* Specifically, we determined that the words "not as individuals" served only to make the required allegation for the § 1983 claim that the defendants were acting under color of law. *See id.* Because this language is often boilerplate, inserted for purposes other than to indicate capacity, we assume the same here.

The court of appeals in this case stated that "the complaint does not expressly identify the capacity in which the state officer is being sued." *Nieto,* 952 P.2d at 842. The court examined the words in the complaint that the defendants' actions were taken "under the authority of their office as officials and employees of the said Colorado Department of Corrections." Based on its reading of the complaint, the court of appeals concluded that the suit was brought against the defendants in their personal capacities. *See id.* at 843. We agree, especially in light of the request for exemplary damages in Count One and not in the other two counts against the State.

 In light of the foregoing, the complaint does not clearly indicate the capacity in which Nieto sued the defendants. When previously confronted with a similar result, we have advised trial courts to look elsewhere. *See Hibbard,* 918 P.2d at 215. The course of proceedings was limited because defendants' motion to dismiss was included in the answer and the trial court dismissed the claims early in the proceedings. However, while Nieto's complaint may have raised questions to objective observers, the defendants acknowledged the suit by affirmatively denying personal liability as a defense—without suggesting before the trial court that Nieto failed to name them as individuals. *See* Defendant's Answer, Motion to Dismiss and Motion to Reconsider, Tenth Affirmative Defense ("As to the individual defendants, the claims are barred by of [sic] the doctrines

of official immunity and qualified immunity which protect these defendants from civil liability for damages."); *see also Hibbard,* 918 P.2d at 216. In its answer, defendants asserted a defense of qualified immunity, which is available only to a government official sued in a personal rather than official capacity. *See* Defendant's Answer, Tenth Affirmative Defense; *see also Biggs v. Meadows,* 66 F.3d 56 (4th Cir.1995) (because qualified immunity is available only in a personal capacity suit, the assertion of that defense indicates that the defendant interpreted the plaintiff's action as being against him personally).

In conclusion, although Nieto's complaint is less than a model of clarity, we conclude that it sufficiently alleges that the individual defendants acted in their personal capacities to withstand a motion to dismiss. Under our precedent and considering the complaint as a whole and the course of the proceedings, we hold that the plaintiff stated § 1983 claims against the individual defendants in their "personal" and "individual" capacities.

## VI. Holding

In sum, we hold that the legislative purpose and the legislative history of section 13–20–602 concur to establish that Nieto was required to file a certificate of review in order to hold the State liable for the malpractice of its employees that are licensed professionals. We also agree with the court of appeals and hold that the individual defendants were not immune from liability pursuant to subsections (2) and (3) of section 24–10–106, and therefore the State cannot escape liability under the Colorado Governmental Immunity Act. Finally, we hold that in examining the complaint and the course of proceedings before the trial court, the court of appeals properly reinstated Nieto's claims under 42 U.S.C. § 1983, which were improperly dismissed against the individual defendants by the trial court.

 At the original trial, the jury awarded damages in the total amount of $1.8 million without any apportionment. That award included an unknown amount for the negligence of nurses and other employees of the correctional facility. In light of our holding

here that the State is not liable for the professional negligence of defendant Norman, that damages award cannot stand and must be vacated.

Accordingly, we affirm in part and reverse in part the judgment of court of appeals, and return this matter to that court for remand to the trial court with directions that it vacate the verdict and award of damages, reinstate Nieto's claims under 42 U.S.C. § 1983, limit the State's negligence liability to employees who are not licensed professionals and conduct further proceedings not inconsistent with this opinion.

Justice HOBBS concurs in part and dissents in part, and Justice MARTINEZ joins in the concurrence and dissent.

Justice HOBBS, concurring in part and dissenting in part:

I concur with the judgment of the court that: (1) the Governmental Immunity Act, section 24–10–106(1), 7 C.R.S. (1999), waives the state's immunity with regard to operation of a correctional facility; (2) the state was not immune from respondeat superior liability for Nieto's injuries under the Governmental Immunity Act, sections 24–10–106(2) and (3), 7 C.R.S. (1999), for the negligent actions of guard Farrell; and (3) the trial court should not have dismissed Nieto's claims under 42 U.S.C. § 1983 against nurse Norman and guard Farrell. I dissent from that portion of the majority's opinion and judgment requiring dismissal for failure to file a certificate of review of Nieto's respondeat superior medical negligence claim against the state based on Norman's conduct.

## I. Construction of the Waiver of Immunity and Certificate of Review Statutes

First, I take issue with the majority's application of the rules of statutory construction from which it launches its resort to legislative history. While I agree that to ascertain legislative intent in construing a statute, we look first to the statute's plain meaning, see *Vaughan v. McMinn*, 945 P.2d 404, 408 (Colo.1997), the majority fails to follow that rule here. As the majority correctly notes, if courts can apply the "ordinary

meaning of words used by the legislature, the statute should be construed as written, giving full effect to the words chosen." Maj. op. at 500.

Our prevailing rule of construction is that "we are not to presume that the legislative body used the language idly and with no intent that meaning should be given to its language." *See Colorado Ground Water Comm'n v. Eagle Peak Farms*, 919 P.2d 212, 218 (Colo.1996)(*quoting McMillin v. Colorado*, 158 Colo. 183, 188, 405 P.2d 672, 674 (1965)). We must respect the words chosen by the General Assembly. *See Zamarripa v. Q & T Food Stores, Inc.*, 929 P.2d 1332, 1341 (1997). When interpreting two statutory sections, we must attempt to harmonize them in order to give effect to their purposes. *See Ragsdale Bros. Roofing, Inc. v. United Bank*, 744 P.2d 750, 752 (Colo.App.1987); *Ortega v. Industrial Comm'n*, 682 P.2d 511, 512 (Colo.App.1984).

The danger of too readily undertaking ambiguity analysis is that we may engage in result-oriented policy choice, rather than construing statutes based upon their provisions, or, when there are seemingly contradictory provisions, reconciling them to effectuate the General Assembly's purpose. In the case at issue here, we can give effect to the plain meaning of the legislature's words, without discovering an ambiguity or absurd result that requires resort to legislative history. Moreover, even if we were to consult legislative history, the majority's use of it here is selective. First, the legislative history of the 1987 debates about the certificate of review statute does not support the majority's conclusion, in my view. Second, the majority fails to address the more recent and relevant 1998 clarifying amendment or its legislative history. This places the court in the curious position of ignoring the act of clarification that the legislature undertook in response to the court of appeals opinion in this very case.

I agree with the majority that the Assembly has waived the state's immunity for injuries arising from the state's operation of a correctional facility. *See* Maj. op. at 506. Although I join the court in its decision to return this case for retrial on the 42 U.S.C. § 1983 claims against Norman and Farrell,

the court could and should let stand the trial court's award of $150,000.00 in regard to the state's respondeat superior liability for the negligent conduct of Farrell and Norman. In my view, the plain meaning of the statute as it existed at the time of the occurrences in the case, and the language of the Assembly's 1998 amendment— by which it clarified its intent to apply the certificate of review requirement to a "firm" or "company" employing medical professionals, see section 13–20–602(1)(b), 5 C.R.S. (1998)— does not include the state.

The terms "company or firm" are specific terms describing particular legal entities and do not embrace the state or its political subdivisions. The legislature did not opt to employ a broader term such as "person," "public entity," "state," or "employer" in this amendment; terms it normally uses when it intends to refer to the state. The Assembly's word choice is especially significant because, in contemplating the amendment, the legislature had before it the court of appeals' opinion in this case, to which the State is a party.

Thus, I would remand for trial only the section 1983 claims, and I would uphold the jury's $1.8 million damages award on the respondeat superior negligence claims, as reduced to $150,000.00 by the trial judge under the damages limitation provisions of the Governmental Immunity Act, section 24–10–114(1)(a), 7 C.R.S. (1999).

### A. Waiver of State Immunity for Respondeat Superior Liability in the Operation of Correctional Facilities

I begin by concurring with the majority's application of the plain meaning rule to section 24–10–106(1)(b), 7 C.R.S. (1999); this provision waives governmental immunity for liability and damages for injuries arising from the negligent operation of a correctional facility. As the court holds, this statute pro-vides that governmental immunity for common law negligence claims "is waived by a public entity in an action for injuries resulting from . . . the operation of any . . . correctional facility," Maj. op. at 507; § 24–10–106(1)(b). Section 24–10–118(2), 7 C.R.S. (1999), must therefore be construed as not intending the immunity of public employees Farrell and Norman. Indeed, applying both of these statutory provisions, the majority determines that "the individual defendants," i.e., Farrell and Norman, "are not immune from liability." See Maj. op. at 506.

I agree that the State's waiver of sovereign immunity is intact for the negligent conduct of the nurse and the guard.[1] The legislature's choice to waive immunity for negligence suits arising from the operation of correctional facilities is plain and its purpose apparent. The legislature's waiver of immunity recognizes that prisoners have no choice in the provision of basic necessities of life, such as food, clothing, and medical care. I read the majority's holding as acknowledging that, in the correctional facility setting, the state has accepted respondeat superior liability for the negligence of its employees, including the failure to provide necessary medical care.

Yet, while the majority upholds the state's respondeat superior liability for the negligence of guard Farrell, who is not a medical practitioner and to whom the certificate of review statute does not apply under the majority's own analysis, it nonetheless requires a new trial on both liability and damages with regard to guard Farrell's negligent conduct. The jury found the state negligent based upon the actions of both Farrell and Norman. See Jury's Answer 2 to Special Verdict Form B.[2] I would uphold the reduced $150,000.00 award for the respondeat

---

1. Instruction No. 10 of the trial judge to the jury provided: "The nurse and employees of the Delta Correctional Center were the agents of the defendant, State of Colorado, Department of Corrections, at the time of this occurrence. Therefore, any act or omission of the agent, if it was within the scope of the agents' authority, was in law the act or omission of the defendant, State of Colorado, Department of Corrections."

2. The verdict form recites the following:

"2. Was the defendant, the State of Colorado Department of Corrections, negligent? (Yes or No)
 ANSWER: Yes."

superior negligence of the state based on the jury's finding.[3]

### B. Inapplicability of the Certificate of Review Requirement to the State

The majority apparently concludes that state liability would exist under the facts of this case, and the jury verdict as to nurse Norman's conduct would be valid, were it not for the certificate of review requirement. Because the majority does not apply the plain meaning of the certificate of review statute, prior to and after the 1998 clarifying amendment, I explicate my view of the statute's meaning.

In my view, as the court of appeals correctly determined, the lack of a certificate of review is not a valid defense for the state under the facts of this case. *See Nieto v. State*, 952 P.2d 834, 838 (Colo.App.1997). The requirement that a plaintiff file a certificate of review prior to initiating a lawsuit applied only to "each licensed professional named as a party." *See* § 13–20–602(1), 5 C.R.S. (1989). As the court of appeals ascertained, the state is not a licensed professional within the ordinary meaning of the statute. The court reasoned that section 13–20–602 requires a certificate of review to be filed in an action based on professional negligence only "for each licensed professional named as a party," within sixty days of service "against such" licensed professional. *Nieto*, 952 P.2d at 838.

Unlike the doctrine of immunity, which, when applicable, bars the lawsuit, the certification requirement operates as a legal defense for licensed professionals accused of medical malpractice. *See, e.g., Lakewood v. Brace*, 919 P.2d 231, 245 (Colo.1996)(distinguishing immunity from suit from defenses to liability). As the majority correctly notes, "[i]mmunity means that the person or entity is incapable of being sued, regardless of fault or wrongdoing," whereas "an affirmative defense is a legal argument that a defendant ... may assert to require dismissal of a suit." Maj. op. at 507 (citations omitted). Under the statute as it existed when the facts of this case arose, only licensed professionals could move to dismiss the complaint for "failure to file a certificate of review." *See* § 13–20–602(2),(4), 5 C.R.S. (1989).

I reach this conclusion because: (1) section 13–20–602(1), as it existed in 1991 at the time of the events in this action, established that the certificate of review shall be filed for "each licensed professional named as a party ... within sixty days after the service of the complaint ... against such licensed professional," *see* ch. 129, sec. 1, § 13–20–602, 1989 Colo. Sess. Laws 750; and (2) section 13–20–602(2) provided that "the licensed professional defending the claim" may move the court for an order "requiring filing of such a certificate" if the licensed professional "believes that an expert is necessary to prove the claim of professional negligence." Section 13–20–602(4) then provided for dismissal of the claim for failure to file a certificate of review "in accordance with this section." The majority opinion fails to acknowledge that 13–20–602(2) was a part of the section to which subparagraph (4) refers. Subparagraph (2) is quite specific: *the licensed professional defending the claim* alone has standing to seek the court's order for filing of the certificate if the plaintiff did not accomplish this within sixty days of the service of the complaint *upon that party*, as provided in subparagraph (1).

Thus, the repeated references to a "licensed professional" in the statute had personal and specific procedural import. Prior to the clarifying amendment, the statute did not clearly indicate its intent to include the employers of licensed professionals. *See Nieto*, 952 P.2d at 838. The court of appeals opinion logically explains that the certificate of review provisions were originally intended by the legislature to address the deleterious effect that a malpractice case can have upon a licensed professional. *See id.* at 838–39.

Negligence lawsuits can impose many burdens upon a licensed professional defendant. First, the professional is subject to discipline if they fail to report to the appropriate li-

---

**3.** At most, remand should be on damages alone, rather than requiring a new trial as to the state's liability for Farrell's conduct.

censing board a malpractice judgment or settlement. Second, the underlying facts of the claim can lead to discipline by the board. Employers of licensed professionals, on the other hand, are not subject to licensing board reporting requirements or discipline. In sum, requiring a certificate of review only as to suits against licensed professionals balances the unique impact of these lawsuits upon a licensed professional, when sued individually, against the burden on injury victims of complying with additional procedural requirements before discovery has even commenced. *See id.*

### C. The Clarifying Amendment

In 1998, the General Assembly amended section 13–20–602(1) to require that a certificate of review be filed with respect to every action against "a company or firm that employed" the licensed health care professional "even if such person is not named as a party in such action." § 13–20–602(1)(b), 5 C.R.S. (1998).[4] The majority addresses only the pre–1998 statute, *see* Maj. op. at 503 n.6, and leaves the effect of the 1998 Amendment open to future interpretation. However, I believe we should view the 1998 legislation as a clarifying amendment controlling application of the statute to this case, because the General Assembly was specifically confronting the issue of employer liability in the course of addressing the court of appeals' decision in *Nieto.* At that point, the legislature chose to clarify the certificate of review requirement as applying only to the respondeat superior liability of a "company or firm." *See* section 13–20–602(1)(b). The state is neither of these entities.

We should give effect to the General Assembly's word choices, particularly as the court is aware that the legislature had the matter of the state's respondeat superior liability before it and chose to address instead only the potential liability of "firms" and "compan[ies]" employing licensed professionals. *See Eagle Peak Farms,* 919 P.2d at 218 ("Our inquiry must focus initially on the language" of the act).

The conscious choice of the legislature is even more evident when we consider that it has frequently distinguished the state from non-state legal entities when drafting regulatory statutes. For example, legislatively-prescribed statutory construction principles provide that the state is included within the meaning of the term "person" when that word is used in a statute. *See* § 2–4–401(8), 1 C.R.S. (1999)(" 'Person' means any individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, limited liability company, partnership, association, or other legal entity"). Likewise, when the term "public entity" appears, as in the Governmental Immunity Act, it is defined to include the "state" and other governmental subdivisions. *See* § 24–10–103(5), 7 C.R.S. (1999). Thus, the state could have been included in the clarifying amendment if the Assembly had chosen to use the term "person," "public entity," or even "employer." *See, e.g.,* § 24–34–401(3), 7 C.R.S. (1999). Despite its frequent use of these terms throughout the Colorado Revised Statutes, it did not select any of them for the certificate of review statute.

To the contrary, the Assembly tailored narrower language; the phrase "firm or company." This choice demonstrates that it intended an entity different from the state or its subdivisions. Typically in our statutes, the words "firm" and "company" are used separately from "governmental entity," indicating that they are normally considered distinct from each other. For example, section 12–28–101(9) of the professions and occupations code defines "person" to include "an individual, partnership, *firm, company,* association, corporation, or *governmental entity.*" § 12–28–101(9), 4 C.R.S. (1999)(emphasis added). Similarly, section 2–4–401 defines "person" broadly, but distinguishes "government or governmental subdivision or agency" from "corporation" or "association," and includes a catch-all reference to any "other legal entity." § 2–4–401(8). The certificate

---

4. The relevant provision, as revised, states: "(b) A certificate of review shall be filed with respect to every action described in paragraph (a) of this subsection (1) against a company or firm that employed a person specified in subsection (a) [the licensed professional] at the time of the alleged negligence, even if such person is not named as a party in such action."

of review statute notably includes no catch-all phrase, or, indeed, any of the terminology commonly used in our statutes when inclusion of a governmental entity such as the state is intended.[5]

We presume that the legislature normally intends statutory amendments to effectuate a change in the pre-existing law. *See People v. Davis*, 794 P.2d 159, 181 (Colo.1990). However, a court may find that a legislative amendment was meant to clarify a previously existing statute when the legislative history, or the language of the statute as amended, clearly indicates an intent to do so. *See Swieckowski v. City of Fort Collins*, 934 P.2d 1380, 1385 (Colo.1997). Here, the state has also argued that the legislature intended to clarify the existing law. *See* State's Opening Brief at 10–11 ("C.R.S.13–20–602(1) was amended on April 22, 1998 when House Bill 98–1372 became law. This amendment makes it clear that this statute also applies to an action brought against companies or firms of licensed professionals. C.R.S. 13–20–602(1)(b). This new section was drafted to clarify an ambiguity rather than change the law and therefore it illustrates the proper interpretation of this earlier statute for the purpose of this action."). By this argument the state either assumed, without analysis, that "firm" or "company" includes the state, or else it has candidly pointed out here that the statutory language encompasses only firms and companies employing licensed professionals.

In either event, the majority's opinion ignores the plain language of the clarifying amendment, the focus and wording of which did not concern the state, although the state's respondeat superior liability was plainly at issue in the *Nieto* decision it had before it. The legislature chose instead to clarify its intent to apply the certificate of review requirement to non-state employers of licensed professionals, *e.g.*, to firms and companies.

5. I also find it instructive in this regard that many other provisions of state law limit the state's exposure to tort liability, both by limiting the subject matter of the cases considered, *see* section 24–10–106 (listing exceptions to the

## D. Legislative History

I would not resort to legislative history in view of the plain wording of the Assembly's statute. Because the majority has done so, however, I point out that at no point in the legislative history set forth in the majority opinion, or in the briefs by the parties, did the General Assembly focus upon the *state's* respondeat superior liability. At the time of the 1998 clarifying amendment, because of the *Nieto* litigation, the testimony of witnesses and legislators addressed the problems faced by professional firms and companies that employ licensed professionals. For example, Representative Swenson, a sponsor of the amendment, testified that:

> The purpose of this Bill is to clarify some of the language that has resulted in the statute not being uniformly applied by the courts. Some of [the] points of this Bill are [that] liability claims are most frequently filed against *the firm* and occasionally principals or employees are named. In a professional liability insurance policy the named insured is defined as *the firm* and all professional staff and employees. So when a professional engineer seals a drawing, it is done on behalf of the firm.

*See* Testimony of Representative Bill Swenson Before the House Jud. Comm., Feb. 27, 1998, regarding H.B. 1372 (emphasis added). Several witnesses also testified about the meaning of the bill for their practice as licensed professionals in the private sector. Byrum Lee, an attorney, noted his interest in the bill because it "may apply to me and my firm." Testimony of Byrum Lee Before the House Jud. Comm., Feb. 27, 1998. Lee argued to the Committee that "this measure that the legislature in its wisdom passed in 1984 to preclude those frivolous suits should extend to both the licensed professional *and the firm employing that professional.*" *Id.* (emphasis added). In response to his comments, Representative Kreutz asked him "how does someone write a certificate of review on a *company*?" Testimony of Rep.

state's immunity from suit), and by limiting the damages which may be awarded against the state. *See* § 24–10–114(1)(b), 7 C.R.S. (1999)(maximum award $150,000 for injury to one person in any single occurrence).

Kreutz Before the House Jud. Comm., Feb. 27, 1998 (emphasis added). These passages show that the discussion prior to the passage of the clarifying amendment concerned non-state employers and their exposure to liability, rather than the state's.

## II.

Accordingly, I would affirm the court of appeals judgment, and I respectfully concur in part and dissent in part as to the court's opinion and judgment.

Justice MARTINEZ joins in this concurrence and dissent.